Filed 8/17/16  P. v. Queseda CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL QUESADA,<br><br>    Defendant and Appellant. | B260485<br><br>(Los Angeles County<br>Super. Ct. No. MA051089) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Murphy, Judge.  Reversed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Tarlyle and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A jury convicted Michael Quesada of attempted voluntary manslaughter, as a lesser included offense of attempted murder, and assault with a deadly weapon. The jury found true the allegations that Quesada personally used a deadly and dangerous weapon (a stabbing instrument) and personally inflicted great bodily injury. (Pen. Code, §§ 12022, subd. (b)(1), 12022.7, subd. (a).)[1] In a bifurcated proceeding, Quesada waived his right to a jury trial, and he admitted he suffered a serious or violent felony conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12), suffered a prior serious felony conviction (§ 667, subd. (a)(1)), and served two prior prison terms (§ 667.5, subd. (b)).

Quesada, representing himself, filed a motion for a new trial. The trial court denied his motion for a new trial and his request to continue the sentencing hearing. The court then sentenced Quesada to 15 years in prison.

Quesada raises four arguments on appeal. First, he argues that the trial court erred by refusing his request to instruct the jury on self-defense. Second, he contends that the trial court erred in refusing to conduct an evidentiary hearing in connection with his motion for a new trial. Third, Quesada argues that the court abused its discretion in denying his request for a short continuance to allow him to prepare for sentencing. Finally, Quesada argues that the court erred in calculating his presentence custody credits. We conclude Quesada's first contention has merit. Because there was substantial evidence to support Quesada's theory of self-defense, the trial court erred in refusing to give the requested self-defense instructions. Because we conclude the failure to instruct on self-defense was not harmless, we reverse.

---

[1] Statutory references are to the Penal Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Combatants and Their Relationship*

This criminal prosecution arises out of a fight at a party in November 2010 between Quesada and his friend, Antonio Canales. The prosecution's theory of the case was that Quesada and Canales fought because Canales was engaged to Quesada's former girlfriend, Desiray Yadao. At the time of the fight, Canales lived with Yadao and Yadao's seven-year-old son. Quesada is the father of Yadao's son. Quesada and Canales had known each other for several years, and were friends when Canales began dating Yadao. Although the two men had fought on prior occasions, these fights, according to Canales, were "nothing big." Canales testified that he and Quesada had engaged in several fistfights, as "friends being friends" when "alcohol is involved," but that after the fights they made up and it was "all forgive and forget."

Quesada agreed that he and Canales were friends. At the time of the fight, Quesada was married to someone else and had another child from that marriage. Quesada told investigators that, although Yadao sometimes made it difficult for him to see his son, Yadao was the "farthest thing [from his] mind." At the time of the party, Yadao had sole custody of their child, and Quesada had supervised visitation.

On November 20, 2010 Canales and Yadao went to a party at the home of a friend called "Animal." Quesada came to the party and challenged Canales to a fight. The two men engaged in a fistfight, which escalated when Canales used a chokehold on Quesada and Quesada used a stabbing instrument on Canales. As a result of the fight, Canales suffered a collapsed lung.

At trial, Canales, Yadao, and another person at the party, Hancel Villatoro, testified about the fight. Canales's treating physician and two Los Angeles County sheriff's deputies also testified. Quesada did not testify.

3

B.    *Canales's Two Versions of the Fight*

Canales's testimony was very different on the two days he testified.  On the first day, Canales stated that he fought with someone at the party he did not know.  He said he did not recall seeing Quesada at the party and did not recall getting into a fight with him.  Canales testified that he has a bad memory because he drinks a lot of alcohol and smokes a lot of marijuana, although he did not drink or smoke at the party.  He stated that a lot of people at the party were outside pushing each other and fighting, and that all of a sudden he got hit in the face.  He did not realize he had been stabbed until after the fight.  When the prosecutor showed Canales pictures of stab wounds on his chest, shoulder area, left tricep, groin area, and neck, Canales confirmed he received those wounds during the fight.  Canales stated he did not go to the hospital immediately because he did not think the wounds were serious.  In fact, he did not think they were stab wounds, but something that just broke his skin.

Canales also stated on his first day of testimony that, two days after the fight, he went to the hospital because he was having trouble breathing.  Canales said he was under the influence of alcohol when he went to the hospital, and he did not recall the treatment he received or his conversations with law enforcement officers that day.

On his second day of testimony, Canales told a different story.  He said stress could have interfered with his memory.[2]  He remembered that Quesada was at the November 20, 2010 party and that he fought with him that night.  Canales testified that when he walked outside of the house he saw approximately 20 people fighting.  He and Quesada started fighting when Quesada "blindsided" Canales by punching him in the face.  The first punch did not knock Canales down, but he and Quesada subsequently tripped and both of them fell to the ground.  At first, Canales was on top, with one of his

---

[2]    Canales was in custody during the trial for failure to comply with a subpoena to testify in this case.  On the first day, he testified that he was not afraid to testify, but he did not want to be at the trial.  On the second day, his testimony was more consistent with what he had told the police.  He said he had been afraid, not because Quesada or anyone else had threatened him, but because of "how the streets work."

knees holding down Quesada's left hand while Canales was hitting Quesada. After approximately 30 seconds, they rolled over and Quesada was on top of Canales, and Quesada had both of his hands free.

Canales testified that while Quesada was on top of him, Canales reached up, put Quesada in a chokehold or a headlock, and wrapped his legs around Quesada's body. Canales demonstrated and explained to the jury that he put his arm in a "chicken wing" position and had Quesada's head between his forearm and upper arm. Canales testified that the chokehold lasted five seconds. While Canales had Quesada in a chokehold, he felt a piercing in his groin. Canales then yelled, "Get him off of me!" Canales specifically testified that first he put Quesada in a chokehold, then he felt the stabbing to his groin, and then he yelled for someone to get Quesada off of him. Canales thought the fight lasted a minute or two.

After people pulled Quesada off of him, Canales got up and walked back inside the house. Canales saw people restraining Quesada and telling him to leave. Quesada was cursing at Canales, but he was not making threats. Canales testified that, once he was inside the house, other people at the party observed holes in his shirt and noticed the stab wounds. He drank a beer and played video games until about 4:00 a.m., when he left with Yadao. Canales did not see Quesada come back to the house that night, nor did he see Quesada's car outside the house at any time after the fight. Quesada did not contact Canales after the fight.

### C.     *Yadao's Version of the Fight*

Yadao testified that on the night of the party Canales had five or six beers and was "buzzed." After she had been at the party for approximately two hours, Yadao heard Quesada's voice coming from the living room and heard people asking him to leave. At the time, she was in another room with Canales and others. Yadao testified that "the party then got [Quesada] outside." Once outside, Quesada was yelling for someone named Joe, or anyone else, to come outside and fight him. When Yadao went outside, she saw a crowd on the lawn and Quesada yelling for Canales to "meet him on the

5

street." When Canales went out to the lawn, Quesada came up to him and punched him in the face. Yadao testified that, although there was a crowd outside arguing, Canales and Quesada were the only ones physically fighting. Other people were standing around watching the fight, and she was watching from about 14 feet away.

In contrast to Canales's testimony, Yadao testified that once Canales and Quesada were on the ground, Quesada was on top at first and was hitting Canales. A minute later, Canales was on top, and he was hitting Quesada and holding him in a headlock. Yadao was uncertain who was on top at the point Canales had Quesada in a headlock. Yadao thought that Canales held Quesada in a headlock for about two minutes while Quesada continued swinging and flailing his arms at Canales's body. Yadao testified that Canales was yelling for somebody to pull them apart because he was getting "poke[d] [with] something." After some of the people there pulled the two men apart, Yadao ran back into the house with Canales. She did not see what Quesada did after the fight, but he was not chasing after Canales or threatening him. Once inside the house, Yadao saw that Canales's shirt was bloody and had holes in it. She helped him clean his wounds, and they left the party an hour later, around midnight. In the car on the way home, Canales told Yadao that he did not know why the fight occurred.

D. *Villatoro's Version of the Fight*

Villatoro lived at Animal's house in November 2010. At that time, he had known Quesada for approximately six months. During the party on November 20, 2010, Villatoro heard people saying that Quesada was outside the house, and he heard people asking Quesada to leave. When Villatoro went outside, he heard Quesada angrily yelling, "Where is Tony [Canales]?" Quesada was yelling that he would fight anyone who kept him from fighting Canales. Villatoro knew that Quesada came to fight Canales because Quesada had challenged Canales to fight before, and the two had fought at another party at the same house in May 2010.

After approximately 10 minutes, Canales came out of the house to the front yard and took off his shirt, which Villatoro understood as signaling an agreement by Canales

6

to fight Quesada. Villatoro was watching from approximately 40 feet away. He did not see who threw the first punch, but he thought they both swung at the same time. He recalled seeing Quesada in a headlock or a chokehold that lasted 10 or 15 seconds while Quesada and Canales were still on their feet. Villatoro saw Canales and Quesada fall to the ground, but he did not remember who was on top first. He recalled that they were on the ground for one or two minutes and that it looked like an even fight. He then heard Canales say, "Get him off of me. He's poking me with something." Villatoro did not see Quesada with any type of weapon in his hand. People watching nearby "split up the fight."

When Canales went into the house, Quesada yelled, "This isn't over." Once Villatoro was back in the house, he saw Canales with his shirt off and saw wounds that looked like "little holes by his ribs." Villatoro did not call the police, and the police did not come to the house.

E.      *The Investigation*

Two days after the party, Canales went to the hospital because he was in pain and was having trouble breathing. At that time, Deputy Christian Chamness of the Los Angeles County Sheriff's Department responded to a report of a stabbing victim receiving treatment at an urgent care facility in Lancaster. Based on information he obtained from Canales, Deputy Chamness contacted Quesada. They agreed to meet in a parking lot of a fast food restaurant in Lancaster because it was close to Quesada's workplace, a construction site. At the meeting, Deputy Chamness found construction tools in the rear storage compartment of Quesada's car and a Phillips head screwdriver in the front passenger area. Deputy Chamness looked through the car for other tools that could have been used to cut, impale, or puncture, but did not find any. He booked the screwdriver into evidence, but never had it analyzed for blood.

Deputy Chamness asked Quesada if he had been in a fight with Canales. Quesada acknowledged that he had been in a fight with Canales in May 2010, but denied the November 2010 incident. Deputy Chamness described Quesada as cooperative, even

7

directing him to Animal's house. Quesada told Deputy Chamness he had lost the May fight and often thought about "payback," but never acted on that thought because he has a family.

The next day, Sergeant Richard Cartmill interviewed Quesada at the Lancaster station jail and recorded the interview. The People played the recorded interview for the jury. In the recording, Quesada denied attending a party at Animal's house on November 20, 2010 and denied he had fought with Canales that night. In response to Sergeant Cartmill's observation that Quesada had bruises and scratches on his back and elbow, Quesada said he was working at a construction site and had fallen from a trash can while trying to push down the debris filling the container. Quesada would not give contact information for his employer because he did not want to involve him.

### F. *Dr. Rauch's Testimony*

Dr. Loren Rauch treated Canales at the hospital for multiple stab wounds to the chest, and he diagnosed Quesada with a collapsed lung as the result of one of the stab wounds. Dr. Rauch also testified that the wounds were not consistent with stabbing by a Phillips head screwdriver. Some of the wounds appeared linear, while others appeared caused by a cylindrical object, like a pen or a nail.

### G. *The Trial Court's Refusal To Give Jury Instructions on Self-defense and Mutual Combat or Initial Aggressor*

Counsel for Quesada asked the court to instruct the jury pursuant to CALCRIM Nos. 3470 and 3471 on self-defense and the right to self-defense where the defendant engages in mutual combat or is the initial aggressor. The trial court acknowledged that it had anticipated Quesada would request these instructions, but denied both requests.

CALCRIM NO. 3470 provides, in relevant part: "Self-defense is a defense to <insert list of pertinent crimes charged>. The defendant is not guilty of (that/those crime[s]) if (he/she) used force against the other person in lawful (self-defense/ [or] defense of another). The defendant acted in lawful (self-defense/ [or] defense of another)

8

if: 1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] <insert name of third party>) was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully]; 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; AND 3. The defendant used no more force than was reasonably necessary to defend against that danger."

The court denied Quesada's request for this instruction because the court found that there was insufficient evidence that Quesada used only the amount of force that a reasonable person would believe was necessary under the circumstances. The court stated: "Here's my problem with the self-defense. And that is the third element. . . . [Reading from the instruction,] 'And the defendant used no more force than was reasonably necessary to defend against danger. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, he, the defendant, did not act in lawful self-defense.' . . . And he was stabbed 10 times."

Counsel for Quesada argued that the number of times Quesada stabbed Canales was not dispositive. Canales's 10 wounds were scattered over different parts of his body, indicating that Quesada inflicted the wounds wherever he could reach while struggling with Canales, as opposed to making a forceful attempt to cause a deep wound to a vital organ. The court disagreed: "If this had been a regular fistfight or a wrestling match, I would agree with you. But once he pulls that screwdriver out and stabs him 10 times, one going in two inches to puncture the lung, he has used more force than was reasonably necessary, under these circumstances, because what it was, it was a fistfight and a wrestling match." In a final attempt to persuade the court, counsel for Quesada argued that "[i]t wasn't a fistfight once [Canales] turns it into a wrestling match and is choking him out. A fistfight is, I hit you with my hand against any part of your body that's accessible. It's not that I cut off the flow of oxygen to your brain." The court still refused to give the instruction.

9

CALCRIM No. 3471 provides in relevant part: "A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if: 1. (He/She) actually and in good faith tried to stop fighting; [AND] 2. (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.) *Give element 3 in cases of mutual combat.* [AND 3. (He/She) gave (his/her) opponent a chance to stop fighting.] If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight. [However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting]."

The court denied Quesada's request for this instruction because there was no evidence Quesada indicated he wanted to stop fighting. The court stated: "That didn't occur. People came out and pulled these folks apart." Although counsel for Quesada objected to the court's refusal to give the mutual combat instruction, neither the attorneys nor the court discussed the bracketed part of the instruction that applies when there is evidence an initial aggressor or mutual combatant uses non-deadly force and his opponent responds with sudden, deadly force.

Despite the court's refusal to instruct the jury on self-defense, counsel for Quesada in closing argument argued facts that supported a self-defense theory. Counsel argued that there was no evidence that Quesada brought a weapon to the fight, such as the screwdriver police found in Quesada's car. Counsel also argued that the locations of the wounds indicated that Quesada was just stabbing at areas he could reach, trying to get out of a chokehold that was cutting off air to his lungs: "[H]e is being choked. He's panicking. He's afraid. He realizes he has something on him that he can use, and he uses it. That means that what he's doing is he's afraid." Counsel for Quesada stated, "Does it

10

take a long time to stab 10 times?  Not when you think you are being asphyxiated, choked to death."

H.    *The Verdict and Sentence*

The jury convicted Quesada of attempted voluntary manslaughter and assault with a deadly weapon.  Quesada, representing himself, filed a motion to dismiss and a motion for a new trial based on, among other things, the court's refusal to instruct the jury on self-defense.  The court denied the motion for a new trial and sentenced Quesada to 15 years in prison.  Quesada filed a timely notice of appeal.

**DISCUSSION**

A.    *Standard of Review and General Law*

Instructional errors are questions of law, which we review de novo.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569-570; *People v. Jandres* (2014) 226 Cal.App.4th 340, 358.)  " " " "[E]ven in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " " "  (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 945, citing *People v. Breverman* (1998) 19 Cal.4th 142, 154; see *People v. Martinez* (2010) 47 Cal.4th 911, 953.)

In the case of defenses, the court must instruct the jury when it appears that the defendant is relying on the defense or if there is substantial evidence to support the defense, and the defense is not inconsistent with the defendant's theory of the case. (*People v. Cottone* (2013) 57 Cal.4th 269, 293; see *People v. Anderson* (2011) 51 Cal.4th 989, 996.)  When the defendant requests an instruction, "the court knows that the defendant is relying on that defense.  Its inquiry then focuses on the sufficiency of such evidence." (*People v. Stevenson* (1978) 79 Cal.App.3d 976, 985; see *People v. Elize*

11

(1999) 71 Cal.App.4th 605, 615 [court should instruct on self-defense if there is substantial evidence of self-defense and the defendant requests an instruction].)  In this context, substantial evidence is evidence that, if believed, would be sufficient for a reasonable jury to find a reasonable doubt as to the defendant's guilt.  (*People v. Eid* (2010) 187 Cal.App.4th 859, 879; see *People v. Mentch* (2008) 45 Cal.4th 274, 288.)  In determining whether the evidence is sufficient to warrant a jury instruction, the court does not determine the credibility of the evidence, but only whether the evidence, if believed by a jury, would be sufficient to raise a reasonable doubt.  (*People v. Mentch,* at p. 288; see *People v. Orlosky* (2015) 233 Cal.App.4th 257, 269-270.)  The court resolves any doubts regarding the sufficiency of the evidence to warrant an instruction in favor of the accused.  (*People v. Moye* (2009) 47 Cal.4th 537, 556.)

B.      *The Court Erred in Refusing To Give an Instruction on Self-defense Because There Was Substantial Evidence To Support the Defense*

"'To justify an act of self-defense . . . the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.  [Citation.]' [Citation.]  The threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065; see *People v. Casares* (2016) 62 Cal.4th 808, 846.)  Issues regarding self-defense are normally questions of fact for the jury. (*People v. Casares,* at p. 846, see *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179 ["[i]t was for the jury sitting as the trier of fact to decide whether appellant actually feared serious injury or death from being choked"]; *People v. Romero* (1999) 69 Cal.App.4th 846, 853 ["'jury must consider what "would appear to be necessary to a reasonable person in a similar situation"'"]; *People v. Clark* (1982) 130 Cal.App.3d 371, 378 ["[i]ssues arising out of self-defense, including . . . whether the force used was

12

excessive, are normally questions of fact for the trier of fact to resolve"], disapproved on another ground in *People v. Blakely* (2000) 23 Cal.4th 82, 92.)[3]

### 1.   *There Was Substantial Evidence That the Amount of Force Quesada Used Was Reasonable*

The self-defense instruction the trial court refused to give, based on CALCRIM No. 3470, provided: "Self-defense is a defense to the crimes charged. The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: 1. The defendant reasonably believed that he or someone else was in imminent danger of suffering bodily injury . . . ; 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [and] 3. The defendant used no more force than was reasonably necessary to defend against the danger." (See *People v. Hernandez* (2011) 51 Cal.4th 733, 747; *People v. Humphrey, supra,* 13 Cal.4th at p. 1089.) As noted, the trial court refused to give this instruction because the court questioned whether Quesada used "no more force than was reasonably necessary to defend against the danger," and whether Quesada used "that amount of force that a reasonable person would believe is necessary in the same situation." (CALCRIM Nos. 3470, 505; §§ 197-199.) The court ruled that Quesada, having stabbed Canales 10 times with a screwdriver, once deep enough to puncture a lung, could not satisfy the third element of the self-defense instruction.

The trial court erred. There was substantial evidence from which a jury could have found that the amount of force Quesada used was reasonable under the

---

[3]    There are two types of self-defense, perfect and imperfect. Both require an actual belief in the need to resort to self-defense. Perfect self-defense also requires that the defendant's belief was reasonable, while imperfect self-defense does not. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) While perfect self-defense is a complete defense to homicide, imperfect self-defense only reduces a homicide from murder to voluntary manslaughter. (See *ibid.*)

13

circumstances, despite the fact there were 10 wounds on Canalas's body. For example, Dr. Rauch described Canales's injuries as "small, puncture-type stab wounds to the left chest wall," shoulder, and neck. Although he estimated that the stab wound to the chest had to have been two inches deep to reach Canales's lung, he testified that the other wounds were only one-half inch deep. Canales testified that, except for the stab to the groin, he did not feel any of the stabs until after the fight, and he did not go to the hospital for some time after the fight because he did not think the wounds were serious. Contrary to the trial court's stated concern, the fact that Quesada stabbed Canales 10 times does not preclude a jury from concluding that the amount of force used was reasonable under the circumstances. As counsel for Quesada correctly argued, "[I]t's not just the 10 times. It's how quickly and where. . . .  [I]t's clear from the scattering of the wounds that it's wherever he could reach as they were rolling this way and that." (See *People v. Ross* (2007) 155 Cal.App.4th 1033, 1057 [for self-defense, the defendant's *conduct* should not be "conflated" with "the *consequences* it produced" because "in the heat of conflict . . . a person cannot be expected to measure accurately the exact amount of force necessary to repel an attack," and a "person will not be deemed to have exceeded his or her rights unless the force used was so excessive as to be clearly vindictive under the circumstances"].)

Moreover, although the court accepted the People's assertion that Quesada stabbed Canales with a screwdriver, there was substantial evidence that the "stabbing instrument" was not a screwdriver, but a less dangerous object. Significantly, Dr. Rauch testified that Canales's wounds were not consistent with a Phillips head screwdriver, the type that Deputy Chamness found in Quesada's car. To the contrary, Dr. Rauch testified that the wounds were punctures, some linear, such that Quesada could have caused them with a pen, a nail, or something similar that Quesada found on the ground or had in his pocket. The police never analyzed the screwdriver Deputy Chamness found in Quesada's car for blood, and the People never introduced it at trial. And the fact that Quesada and Canales had engaged in previous fistfights in which they had not used weapons is circumstantial evidence that Quesada did not come to the party armed with a dangerous or deadly

14

weapon, but instead found something at the scene that he used when Canales put him in a headlock. Because there was substantial evidence regarding the third element of self-defense, that Quesada did not use unreasonable force in defending himself from Canales, the trial court should have let the jury decide whether Quesada used no more force than was reasonably necessary under the circumstances.[4]

2. *Quesada Was Entitled to an Instruction on Self-defense Even If He Started the Fight*

The People argue that Quesada was not entitled to an instruction on self-defense because he was the initial aggressor. A person who starts a fight with non-deadly force, however, does not necessarily give up his or her right to self-defense. (See *People v. Ramirez, supra*, 233 Cal.App.4th at p. 943 ["person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby 'forfeit[ ] . . . his right to live'"], citing *People v. Conkling* (1896) 111 Cal. 616, 626.) For example, in *People v. Vasquez* (2006) 136 Cal.App.4th 1176, the defendant, who was in a wheelchair, called the victim into an alley to confront him about whether he had raped the defendant's cousin. (*Id.* at p. 1178.) Reacting to the accusation, the victim lunged at the defendant and began to choke him. (*Ibid.*) In response, the defendant pulled out a gun and shot the victim, killing him. (*Ibid.*) The trial court refused to instruct the jury on imperfect self-defense because the court found the defendant created the need to defend himself by luring the victim into the alley. (*Id.* at p. 1179 & fn. 3.) The Court of Appeal reversed, acknowledging that the defendant was "up to no good . . . when he invited [the victim] to the alley" and that the defendant "generally set in motion the circumstances that led [his] victim[ ] to attack

_____

[4]    The trial court did not, and the parties on appeal do not, address whether there was substantial evidence on the first two elements of the self-defense instruction, whether Quesada reasonably believed he was in imminent danger and whether immediate use of force was necessary. This may be because the evidence of Canales's use of a headlock is substantial evidence not only that the amount of force Quesada used was reasonable, but also that Quesada reasonably believed he was in imminent danger and that immediate use of force was necessary.

[him].  [Citation.]  But . . . the evidence suggested the victim[ ], not the defendant[ ], used unlawful force first.  Accordingly, [the defendant] was entitled to assert imperfect self-defense." (*Id.* at p. 1180; see *People v. Quach* (2004) 116 Cal.App.4th 294, 301-302 ["'[w]here the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force,'" and "'[i]f the victim uses such force, the aggressor's right of self-defense arises'"].)

Here, although the People argue that Quesada initiated the fight with deadly force, the evidence does not support their argument.  To the contrary, there is substantial evidence that, although Quesada started the fight using non-deadly force by hitting Canales, Canales was the first one to use deadly force by putting Quesada in a headlock.  On cross-examination, Canales testified that the headlock, or chokehold, preceded the stabbing: "Q:  So you get him in a chokehold.  He stabs you in the groin.  You yell, 'Get him off me?'  A. Yes.  Q:  Those three events give the right order?  A:  Yes, sir.  Q: Chokehold, stab, get him off me. . . .  He's then pulled off?  A:  Yes, sir."  Moreover, contrary to the People's suggestion that the stabbing began as soon as Quesada was on top of Canales, but before Canales put Quesada in a headlock, Canales testified that he did not feel the stab to his groin (the only stab he felt) until after he had Quesada in a headlock.  In addition, while the testimony of Yadao and Villatoro regarding how Canales put Quesada in a headlock and how long he kept him there differed in minor details, neither account supported an inference that Canales put Quesada in a headlock after the stabbing.  Because substantial evidence supported the theory that Quesada started a fistfight with nondeadly force (punching) and resorted to deadly force (stabbing) only in response to Canales's use of deadly force (a chokehold), a jury instruction on self-defense was warranted.  (See *People v. Vasquez, supra,* 136 Cal.App.4th at p. 1180.)

The People argue that, even if Canales's use of a headlock preceded Quesada's use of a stabbing instrument, a headlock is not "deadly violence" that would justify Quesada's use of deadly force in response.  This argument fails for two reasons.  First, as Quesada argues, the use of chokeholds may cause serious injury or death.  (See, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1132 [teacher put in chokehold by student

16

suffered bruised larynx, long-term throat pain, and temporary loss of voice], disapproved on other grounds by *People v. Scott* (2015) 61 Cal.4th 363; *People v. Brown* (2016) 245 Cal.App.4th 140, 160-161 [police officer sat on victim's back and placed him in a chokehold that collapsed victim's air passages causing death by suffocation].) Second, the issue is not whether Canales's chokehold was actually deadly force, but whether Quesada reasonably believed it was.[5]

The People cite *People v. Duke* (1985) 174 Cal.App.3d 296 for the proposition that headlocks are not deadly force. In *Duke* the court concluded that the evidence of the headlock in that case did not support a conviction for assault with force likely to cause great bodily injury. (*Id.* at p. 303.) Thus, the issue in *Duke* was not the chokehold victim's reasonable belief, but rather whether the amount of force the defendant used actually was likely to cause great bodily injury. (*Id.* at p. 302.) *Duke* did not hold that a headlock or a chokehold is never deadly force. As counsel for Quesada argued to the trial court, although opinions may differ on whether Canales would have choked Quesada to death, the issue is not whether Canales could or would have choked Quesada to death, but whether Quesada, in that moment, honestly and reasonably believed he was in imminent danger of serious bodily injury, and whether the amount of force he used was reasonably necessary to defend against the chokehold. (See *People v. Casares, supra*, 62 Cal.4th at p. 846.)

The People also argue that there was no evidence Quesada "ever attempted to stop fighting with [Canales], communicated such a desire in such a way that a reasonable person would understand that he wanted to stop fighting, actually stopped fighting, or

---

[5] The People also argue that Canales's headlock did not justify Quesada's stabbing because Quesada suffered only minor injuries. The degree of Quesada's injuries, however, does not preclude a jury from finding, based on substantial evidence, that at the time of the fight Quesada reasonably believed the headlock was life-threatening. (See *People v. Humphrey, supra*, 13 Cal.4th at pp. 1093-1094 ["'[j]ustification does not depend upon the existence of actual danger but rather depends upon appearances; it is sufficient that the circumstances be such that a reasonable person would be placed in fear for his safety and that the defendant acted out of that fear'"].)

17

gave [Canales] an opportunity to stop fighting prior to stabbing him."[6] It is true, as reflected in the second self-defense instruction the trial court refused to give, CALCRIM No. 3471, that a defendant who starts a fight (or engages in mutual combat) has a right to self-defense only if the defendant tries to stop fighting, indicates by words or conduct that he or she wants to stop fighting, and gives his or her opponent a chance to stop fighting. (See *People v. Johnson* (2009) 180 Cal.App.4th 702, 712; *People v. Quach*, *supra*, 116 Cal.App.4th at pp. 300-301.) And it is also true that there is no evidence Quesada tried to stop fighting, indicated he wanted to stop fighting, or gave Canales a chance to stop fighting.

As also provided by CALCRIM No. 3471, however, a person who starts a fight (or engages in mutual combat) does not have to satisfy these "stop fighting" requirements where the person used non-deadly force and his or her opponent responded with "'such sudden and deadly force that the defendant could not withdraw from the fight.'" (See *People v. Frandsen* (2011) 196 Cal.App.4th 266, 271; *People v. Quach*, *supra*, 116 Cal.App.4th at pp. 301-302.) As the People appropriately concede, acknowledging that an initial aggressor or mutual combatant still has a right to self-defense when his or her opponent responds with sudden, deadly force, "This is not to suggest that [Quesada], as the initial aggressor, completely forfeited his right to self-defense under all circumstances." And there was substantial evidence that Canales employed the headlock so suddenly that Quesada could not try, announce or indicate that he wanted, or give Canales an opportunity to stop fighting. The fight lasted a very short time, perhaps only a

---

[6] As noted, at trial neither the court nor the parties addressed whether Quesada was the initial aggressor or a mutual combatant and, if so, whether he was nevertheless entitled to instructions on self-defense. In his opening brief Quesada noted that the trial court considered CALCRIM No. 3470 and CALCRIM No. 3471 separately, and he stated that he was not challenging "the court's failure to give the right to self-defense during mutual combat instruction." Because the People in their respondent's brief argued primarily that Quesada was not entitled to self-defense instructions because he was the initial aggressor, Quesada addressed that argument in his reply brief. The People do not argue that Quesada forfeited his argument that the trial court erred by failing to instruct on self-defense pursuant to CALCRIM No. 3471.

18

minute or two. Canales described wrestling with Quesada and, after Quesada rolled on top of him, squeezing Quesada's head between his upper arm and forearm and wrapping his legs around Quesada's body. Yadao testified that Canales had Quesada in a headlock within a minute of when the fight began. These facts constitute substantial evidence that Canales's use of a headlock happened so quickly and so aggressively that Quesada did not have the opportunity to comply with the three elements of CALCRIM No. 3471.[7]

C.     *The Trial Court's Error in Refusing To Instruct on Self-defense*
       *Was Not Harmless*

Having concluded that substantial evidence supported instructing the jury on self-defense, even though Quesada was either the initial aggressor or engaged in mutual combat, we will not reverse unless, after an examination of the entire case and all the evidence, it is reasonably probable that Quesada would have obtained a more favorable outcome had the error not occurred. (See *People v. Blakeley* (2000) 23 Cal.4th 82, 93, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) and *People v. Breverman*, *supra*, 19 Cal.4th at p. 176.)[8] Under the *Watson* standard, an instructional error is

---

[7]     The People argue that Quesada's statement to Detective Chamness that he "'often thought about payback'" for the May 2010 fight, and his statement at the end of the fight, "This isn't over," suggest that Quesada did not act in self-defense. And perhaps they do. But the issue is not whether there was substantial evidence Quesada did not act in self-defense, but whether there was substantial evidence that he did. And there was.

[8]     Citing federal authority such as *United States v. Escobar de Bright* (9th Cir. 1984) 742 F.2d 1196, 1201, Quesada argues that the trial court's error in failing to instruct the jury on self-defense is "reversible per se." In the alternative, Quesada urges us to apply the standard set forth in *Chapman v. California* (1967) 386 U.S.18, 24, where federal constitutional errors are reviewed under the standard mandating reversal unless the government proves the error was harmless beyond a reasonable doubt. The California Supreme Court has not yet determined which standard of prejudice applies to an erroneous failure to instruct on self-defense. (See *People v. Salas* (2006) 37 Cal.4th 967, 984; *People v. Simon* (1995) 9 Cal.4th 493, 506, fn. 11.) Most Courts of Appeal that have addressed the issue of instructional errors related to defenses, however, have applied the *Watson* standard (see, e.g., *People v. Villanueva* (2008) 169 Cal.App.4th 41, 52;

19

prejudicial where, "'after an examination of the entire cause, including the evidence' [the reviewing court] is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson,* at p. 836.) "Probability under *Watson* 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.'" (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1335; see *People v. Wilkins* (2013) 56 Cal.4th 333, 351.)

The jury heard evidence that Canales put Quesada in a chokehold before Quesada stabbed Canales, that the stabbing instrument was not a screwdriver Quesada brought with him to the fight, and that most of the wounds were approximately half an inch deep and scattered over different areas of Canales's body. Yet, because the trial court ruled that Quesada was not entitled to instructions on self-defense, the People were able to argue to the jury that Quesada's stabbing of Canales necessarily constituted illegal force: "There is no legal right to self-defense in this case. If you found that the defendant did, in fact, stab . . . the victim . . . it is illegal force."

Had the trial court instructed the jury with CALCRIM Nos. 3470 and 3471, including the paragraph explaining that an initial aggressor may only use deadly force in certain limited circumstances, there is a reasonable probability that Quesada would have obtained a more favorable result. The jury would have had the opportunity to evaluate whether the stabbing was, as the prosecutor argued, necessarily illegal force. The jury would have known that Quesada was justified in using deadly force, even though he started or agreed to the fight and did not try to or communicate he wanted to stop fighting, if (1) Quesada used non-deadly force and (2) Canales "responded with such

---

*People v. Russell* (2006) 144 Cal.App.4th 1415, 1431-1432), or concluded that the error was either harmless or prejudicial under either standard (see, e.g., *People v. Watt* (2014) 229 Cal.App.4th 1215, 1220; *People v. Sherow* (2011) 196 Cal.App.4th 1296, 1309). Because we conclude the court's instructional error was not harmless under the more lenient (to the prosecution) *Watson* standard, we need not decide which standard applies. (See *People v. Simon, supra*, 9 Cal.4th at p. 506, fn. 11; *People v. Russell, supra*, 144 Cal.App.4th at p. 1432.)

sudden and deadly force" that Quesada "could not withdraw from the fight." The jury also would have known that the People had the burden to prove beyond a reasonable doubt that Quesada did not use excessive force in responding to Canales's use of force. (See *People v. Saavedra* (2007) 156 Cal.App.4th 561, 571 ["[t]ypically, the prosecution has the burden to prove a defendant did not act in self-defense, because self-defense negates an element of the offense"]; *People v. Lee* (2005) 131 Cal.App.4th 1413, 1429 ["[f]or the defense of self-defense . . . the People have the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense"]; *People v. Adrian* (1982) 135 Cal.App.3d 335, 340-341 [the People have the burden to prove beyond a reasonable doubt the defendant's use of force was not in lawful self-defense].) At a minimum, it is reasonably probable that one or more jurors would have found that the People had not proved beyond a reasonable doubt that Quesada did not act in self-defense, which would have resulted in, at worst, a hung jury, or at best, an acquittal. (See *People v. Mason* (2013) 218 Cal.App.4th 818, 826 ["even if a properly instructed jury would not have voted to acquit [defendant], the views of some jurors may have been swayed resulting in a hung jury," which "is a result more favorable to [defendant]"]; *People v. Soojian* (2010) 190 Cal.App.4th 491, 520 ["under the *Watson* standard a hung jury is considered a more favorable result than a guilty verdict"]; accord, *People v. Poletti* (2015) 240 Cal.App.4th 1191, 1208.) The trial court's erroneous refusal to instruct the jury on self-defense was not harmless.

## DISPOSITION

The judgment is reversed.



SEGAL, J.

We concur:



PERLUSS, P. J.                                        ZELON, J.

21